MELVIN C. ELLIS, APPELLEE, v. FAR-MAR-CO, INC., A KANSAS CORPORATION, APPELLANT, AND THE HOME INSURANCE COMPANY, A CORPORATION, APPELLEE.

340 N.W.2d 423

Filed November 28, 1983. No. 82-289.

Scott J. Norby of Crosby, Guenzel, Davis, Kessner & Kuester, for appellant.

Richard D. Sievers of Marti, Dalton, Bruckner, O'Gara & Keating, P.C., for appellee Ellis.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

HASTINGS, J.

This is an action for damages for personal injuries sustained by the plaintiff while he was a business invitee on the premises of the defendant. The jury returned a verdict of $67,000 in favor of the plaintiff, and the defendant has appealed.

The plaintiff, Melvin C. Ellis, is an experienced, licensed grain sampler employed by The Lincoln Inspection Service. On February 22, 1980, the plaintiff

was sampling grain at the defendant Far-Mar-Co's grain elevator in Lincoln, Nebraska. He was working with three employees of the defendant, known as the track crew, who were loading grain hopper railroad cars in the track shed loading area at the defendant's elevator.

The track crew consists of a loader, a brakeman, and a flagman. The railroad cars are brought into the loading area, which is on a downhill grade, and stopped so the compartment opening on the top of the first car is positioned directly under the load-out chute, which comes down from the elevator and fills the car from the top. Grain hopper cars have either three or four compartments. The loader stands on top of the car that is being loaded and operates the controls for the load-out chute, and raises and lowers the chute in and out of the compartment openings. He also signals the flagman, who stands on the ground next to the car, to direct the starting or stopping of the flow of grain. When a compartment is loaded, the grain chute must be lifted out of the compartment opening in order for the car to be moved. When lifted, the bottom of the spout clears the top of the car by approximately 18 to 24 inches.

After the loading chute is raised the loader or the flagman signals the brakeman to release the brake to permit the car to roll forward to the next compartment opening. The brakeman is situated at the end of the car and takes directions from the loader or flagman, since he cannot see the top of the car. When a car is filled with grain, the brake is released and the car rolls out of the loading area. The grain sampler works with the loading process to obtain samples of grain from each car as it is loaded.

On the date of the accident the plaintiff was working with the track crew of the defendant when the cars were being loaded. When a car was full and the plaintiff had completed his sampling, another car would be moved in and the plaintiff would move his samples and equipment to the next car, or if

there was no next car, to a platform located alongside the top of the railroad cars. At the time of the accident the plaintiff had just finished probing the last compartment of the last car in a string of eight cars.

There is a direct conflict in the testimony regarding the events surrounding the loading and sampling of the last car. The plaintiff testified that he was standing on top of the car, waiting to close the last compartment, with the load-out chute to his back, when the car suddenly began to move forward, away from the platform. He testified that he slid his tools and equipment onto the platform, but before he was able to leave the car himself, the load-out chute bumped him on the back. To avoid being pushed off the car by the chute, the plaintiff jumped off the edge of the car and injured himself on the track below.

The plaintiff offered the testimony of Far-Mar-Co's loader that he saw the plaintiff gather his tools and step off the top of the car onto the platform alongside the car. He said that he then told the brakeman to release the brake, looked again, and saw that the plaintiff was still on the platform. The loader then climbed off the car and the brake was released. Obviously, the jury disbelieved this testimony, as it had a right to do.

No witnesses saw the plaintiff fall. The general manager of the elevator was the first to reach the plaintiff lying on the tracks, and he testified the plaintiff told him that the chute knocked him off the car. The plaintiff sustained a compression fracture of the lateral talus and a fracture of the tibia.

The defendant's primary contention on this appeal is that instruction No. 14, given over the objection of the defendant, was erroneous and prejudicial. The critical paragraph of that instruction is: "If an employee or employees of a grain elevator know or should know that a grain inspector is working on top of [a] railroad grain car, such employee or employ-

ees have a duty to warn the grain inspector that the grain car is about to be moved and give the inspector a reasonable time in which to protect himself from injury before the rail grain car is moved."

Defendant contends that the above paragraph included in instruction No. 14 is an incorrect statement of the law because it instructed the jury that the defendant had a duty to warn the plaintiff of the danger, regardless of whether the plaintiff also had knowledge of the danger. In other words, the defendant contends the instruction took away a factual consideration from the jury, the question whether a possessor of land had an affirmative duty to warn.

The defendant, citing NJI 8.22 and Restatement (Second) of Torts §§ 341A and 343 (1965), insists that there is no duty on the part of a possessor of land to warn an invitee unless such possessor should expect that the invitee did not know of or would not discover the danger and would fail to protect himself.

The plaintiff contends that this is not a case of pure premises liability, but rather it involved active negligence on the part of defendant's loading crew.

We agree with the position taken by the plaintiff. This accident did not arise out of a defect or condition of the premises. Rather, as determined by the jury, it was due to a failure on the part of those employees charged with the responsibility for moving the grain cars to do so in a reasonable manner.

*Crotty, Aplnt. v. Reading Industries*, 237 Pa. Super. 1, 345 A.2d 259 (1975), involved an accidental injury suffered by the plaintiff while on the defendant's premises as an independent contractor. He was there for the purpose of adjusting a machine which utilized a large carousel-type conveyor system. The plaintiff pushed a "stop" button which shut off the power to the system, although he was aware of the fact that there were two other controls which acted as a master switch. While working on the machine, an employee of the defendant started

up the machine, unaware of the plaintiff's presence, and as a result the injuries were sustained.

The Pennsylvania court agreed with the defendant that the law is well settled that there is no duty to warn or guard a business visitor against a danger that is known or obvious, citing the Restatement (Second) of Torts §§ 341A and 343A (1965). However, it went on to say at 11, 345 A.2d at 264: "We find the appeal of these arguments more superficial than substantial. In the instant case the appellant [plaintiff] was an acknowledged expert in the operation of the industrial device which was the instrument of his injuries. However, it was not a malfunction or a defect in the machine which caused his injuries; it was a failure on the part of the operator of that machine to look before he began his enterprise. Appellant was well aware of the dangers inherent in the instrumentality, but not necessarily aware of the dangers inherent in its agent."

The same is true in the instant case. The plaintiff was well aware of the dangers inherent in his job generally. However, he would not be expected to know that the defendant's agents would cause the grain car to be moved, without warning, while he was in a position of danger required in the exercise of his duties. We believe, under the circumstances of this case, that it was reasonable to impose on the defendant the duty to warn a grain inspector working on the top of a grain car before the car is moved.

Even though we reject defendant's contention that the rules found in §§ 341A and 343 are applicable to this case, we would suggest that Comment *f.* to § 343A is relevant. Comment *f.* at 220 states: "There are, however, cases in which the possessor of land can and should anticipate that the dangerous conditions will cause physical harm to the invitee notwithstanding its known or obvious danger. In such cases the possessor is not relieved of the duty of reasonable care which he owes to the invitee for his protection. This duty may require him to warn

the invitee, or to take other reasonable steps to protect him, against the known or obvious condition or activity, if the possessor has reason to expect that the invitee will nevertheless suffer physical harm.

"Such reason to expect harm to the visitor from known or obvious dangers may arise, for example, where the possessor has reason to expect that invitee's attention may be distracted, so that he will . . . fail to protect himself against it. . . ."

One of the defendant's own employees testified that there was a company rule that a car cannot be moved when there is a sampler on top of it. In this case the danger to the plaintiff was obvious. The defendant's crew controlled the movement and time of movement of the grain cars. This is a case in which the defendant's employees should have anticipated that the movement of the car could cause physical harm to the plaintiff. Under such circumstances, reasonable prudence would dictate that a warning be given. This is true even though it would be obvious to the plaintiff that at some time during the testing procedure the car could possibly be moved. Plaintiff, by the very nature of his job, was required to be where he was, and he could not satisfactorily perform that job while laboring under the constant threat of a movement of the car without warning. "[C]ourts will find a duty where, in general, reasonable men would recognize it and agree that it exists." W. Prosser, Handbook of the Law of Torts, *Limited Duty* § 53 at 327 (4th ed. 1971). Instruction No. 14 was correct.

The issues of plaintiff's knowledge of existing dangers and his duty to protect himself are covered by other instructions on proximate cause, assumption of risk, and contributory negligence. Instructions must be taken as a whole and construed together, and when instructions cover the issues and fairly submit the case to the jury, the jury's verdict will not be disturbed unless it is clearly erroneous. *Lane*

*v. State Farm Mut. Automobile Ins. Co.*, 209 Neb. 396, 308 N.W.2d 503 (1981).

The second assignment of error on appeal is that the trial court erred in overruling the defendant's motion for new trial on grounds of juror misconduct.

After the first of 2 days of jury deliberations, one juror identified himself as a journalist or a juror and called one of the witnesses who testified in the case to ask him whether there was an ownership relation between The Lincoln Inspection Service and the defendant. Both counsel joined in a motion to reconvene the jury. The juror admitted making the telephone call, but stated he did not discuss the substance of the call with the other jurors and that he was the one juror voting against the plaintiff in the 11-to-1 verdict. All 11 other jurors supported the juror's testimony that he did not mention he had made the telephone call. The trial court found that none of the 11 jurors who agreed to the verdict were prejudiced or influenced in any manner by the telephone call, and that if the call was prejudicial it would have been against the plaintiff rather than the defendant.

This court has not wavered in the interpretation of the law in juror misconduct situations. It is well established that charges of juror misconduct must be substantiated by competent evidence on the motion for new trial, the misconduct complained of must relate to a matter in dispute relevant to the issues in the case, and the misconduct must have influenced the jurors in arriving at a verdict. *Schwank v. County of Platte*, 152 Neb. 273, 40 N.W.2d 863 (1950). Proof of mere indiscretion in the conduct of a juror is not suffucient to avoid a verdict unless the proof establishes that his conduct was of such character that prejudice may be presumed. *Schwank, supra*; *Wessel v. Bishop*, 76 Neb. 74, 107 N.W. 220 (1906).

The evidence before the trial court on the juror misconduct issue was that although there had been misconduct by one juror, the other 11 were un-

involved, did not know of it, and decided the case only on the evidence presented at trial. We cannot accept the defendant's contention that the juror's misconduct irrebuttably presumes prejudice. Furthermore, Neb. Rev. Stat. § 27-606(2) (Reissue 1979) specifically provides for inquiry into the validity of a verdict when extraneous prejudicial information may have been improperly brought to the jury's attention.

When a new trial is sought for juror misconduct, the finding of the trial court will not be set aside unless the evidence of misconduct is clear and convincing. *Winston v. Davis*, 187 Neb. 522, 192 N.W.2d 413 (1971). We conclude that there is no showing of prejudice to the defendant, and the trial court properly rejected the motion for new trial.

For the reasons above stated the judgment of the trial court should be affirmed.

AFFIRMED.