STATE OF NEBRASKA, APPELLEE,
v. TODD R. BACHELOR, APPELLANT.
575 N.W. 2d 625

Filed January 27, 1998.    No. A-96-851.

Michael J. Hansen, of Berry, Kelley, Hansen & Burt, for appellant.

Don Stenberg, Attorney General, and Marilyn B. Hutchinson for appellee.

HANNON, SIEVERS, and INBODY, Judges.

SIEVERS, Judge.

## INTRODUCTION

This case has its inception in the bite that a bar bouncer, Todd R. Bachelor, took out of the nose of Paul Ellis. We are called upon to address, apparently for the first time in this state,

whether parts of the human body, specifically teeth, can constitute dangerous instruments under Neb. Rev. Stat. § 28-309 (Reissue 1995), Nebraska's second degree assault statute.

## FACTUAL BACKGROUND

On November 18, 1992, Paul Ellis, a truckdriver from Washington State, was having his truck repaired in York, Nebraska, where he had decided to stay for the night at the U.S.A. Inn. Ellis went to the U.S. Mint Lounge (a bar in the U.S.A. Inn) that evening for a couple of drinks. Todd R. Bachelor was working as a self-appointed bouncer at the U.S. Mint Lounge on this same night.

According to Ellis, as he was sitting at the bar, he noticed Bachelor and Rick Hickman, a man Ellis had previously been drinking with, shoving each other. When Ellis attempted to assist Hickman, Bachelor allegedly told Ellis to mind his own business or Bachelor was going to bite Ellis' nose off. Ellis then fell and cut his elbow on a table. Ellis was asked to leave after this altercation. Ellis walked out of the lounge, caught his breath, and returned to the bar because "I wasn't the man in there provoking this thing . . . ."

Upon returning to the bar, Ellis and Bachelor engaged in a "stare down." Then, according to Ellis' testimony:

> Well, the people that were around Todd kind of dispersed. We walked to each other and there are some tables in here and I was walking pretty briskly and I'm sure I was moving chairs as I was walking towards him. I threw one three or four feet. I don't believe I hit anybody. We locked arms, the best I can remember. Somehow Todd came at me. Todd's arms were around my waist here. . . .
>
> . . . .
>
> . . . And I was trying to push him away and the last thing I really remember is a mouth coming over my — my nose and then the blood coming out profusely. And I started screaming.

With respect to the biting incident, Jacqueline Hickman, a witness for the plaintiff, the State of Nebraska, stated: "I was standing back there and the guy had Todd by the throat and Todd bit his nose." Another witness, Karen Kelly, stated that Ellis "had like a choke strangle hold on Todd."

York police sergeant Norm Cobb was dispatched to the U.S.A. Inn on a disturbance call at 12:30 a.m., November 19, 1992. Cobb was greeted by a screaming Ellis in the foyer of the motel. After Cobb attempted to calm Ellis down and after Ellis tried to go back into the bar, Ellis was arrested for disorderly conduct and taken to a hospital. Bachelor, after admitting he had bitten Ellis, was restrained and taken to the sheriff's department. Officer Mikki Hoffman booked Bachelor into jail that morning and noted that although Bachelor's hands were red, there were no bruises or lacerations around his neck.

## PROCEDURAL BACKGROUND

Bachelor was charged by information on March 1, 1993, with one count of assault in the first degree, intentionally or knowingly causing serious bodily injury to another person, pursuant to Neb. Rev. Stat. § 28-308 (Reissue 1995); one count of assault in the second degree, intentionally or knowingly causing bodily injury to another person with a dangerous instrument or recklessly causing serious bodily injury to another person with a dangerous instrument, pursuant to § 28-309; and criminal mischief under $100. The information also alleged that Bachelor was a habitual criminal based on two previous convictions, one for distribution of a controlled substance and the other for aiding and abetting burglary.

In response to this information, Bachelor filed a plea in abatement on March 30, 1993. In this plea, Bachelor prayed that the information with respect to counts I and II be quashed because (1) there was no evidence that Bachelor used a dangerous instrument to cause bodily injury and (2) the evidence demonstrated that the injuries to Ellis were the result of a mutual fight, which made the assault, if anything, an assault in the third degree. The plea was overruled on August 10. Bachelor then filed a motion to quash count II "for the reason that the allegation therein set forth is in fact a lesser included offense of Count I thereby subjecting the Defendant to issues of double jeopardy within the pleading." The motion to quash was denied on September 21.

On January 18, 1994, the State moved to dismiss count III, criminal mischief, with prejudice. The district court granted the

motion, and the case proceeded to trial on the two assault charges.

Bachelor's trial lasted 4 days. During the first 3 days, the parties introduced conflicting evidence on the position of Ellis' hands during the seconds before he was bitten. Some witnesses testified that Ellis' hands were located around Bachelor's throat, while others maintained Ellis was merely pushing against Bachelor's chest. On the fourth day, the jury was instructed that on the charge of assault in the second degree, a "dangerous instrument is *anything* which, because of its nature and the manner and intention of its use, is capable of inflicting bodily injury." (Emphasis supplied.) Bachelor's attorney objected to this instruction and proposed that the term "object" be substituted for the term "anything." The court refused to change its instruction in the following exchange with Bachelor's attorney:

[Counsel]: If I may go quickly back to the definitions, Your Honor. You've defined a dangerous instrument as anything . . . — in State v. Hatwoan, H-A-T-W-O-A-N [sic], 208 Neb. 450, [303 N.W.2d 779 (1981)] they define a dangerous instrument as any object which, because of its nature and the manner of its intention of use, is capable of inflicting bodily injury. And . . . they use the term object there rather than anything.

THE COURT: I understand that, but here we didn't have an object in the sense that it was separate and apart from ones person. This was teeth.

[Counsel]: Exactly my position, Your Honor.

THE COURT: Well, I think anything covers it.

. . . .

THE COURT: . . . I'm not going to give it because in this case we don't have that. We have — We have a person's jaw and his teeth, much the same as a fist or a hand. . . .

. . . .

[Counsel]: I propose it as —

THE COURT: Object.

[Counsel]: — object and therefore would object to the term anything in that particular definition.

THE COURT: Okay.

The district court also instructed the jury that if the State failed to carry its burden of proof with regard to first degree assault,

the jury was to consider whether Bachelor was guilty of the lesser-included offense of third degree assault.

On January 21, 1994, Bachelor was convicted of second degree assault, a Class IV felony, and third degree assault, a Class I misdemeanor. Bachelor, who was to be sentenced on March 8, failed to appear at the hearing, and the district court issued a bench warrant for Bachelor's arrest. Over 2 years later, on July 9, 1996, Bachelor was sentenced as a habitual criminal, under Neb. Rev. Stat. § 29-2221 (Reissue 1995), to an indeterminate sentence of imprisonment of not less than 10 nor more than 14 years for assault in the second degree. He received a sentence of imprisonment of 3 months for the third degree assault conviction, to run concurrent with the sentence on the second degree assault conviction. Bachelor timely appealed to this court.

## ASSIGNMENTS OF ERROR

Bachelor contends on appeal that the district court erred in (1) accepting the jury's verdict with regard to second degree assault when the evidence was insufficient to convict, (2) refusing to give Bachelor's proposed jury instruction defining the term "dangerous instrument" as an "object" rather than as "anything," (3) accepting the jury's verdicts with respect to Bachelor's second and third degree assault convictions because this amounted to double jeopardy, and (4) accepting the jury's verdicts that Bachelor had not acted in self-defense.

## STANDARD OF REVIEW

On a claim of insufficiency of the evidence, an appellate court will not set aside a guilty verdict in a criminal case where such verdict is supported by relevant evidence. *State v. Earl*, 252 Neb. 127, 560 N.W.2d 491 (1997); *State v. Privat*, 251 Neb. 233, 556 N.W.2d 29 (1996).

When reviewing a question of law, an appellate court reaches a conclusion independent of the lower court's ruling. *State v. LeGrand*, 249 Neb. 1, 541 N.W.2d 380 (1995).

In reviewing a criminal conviction, it is not the province of an appellate court to resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or reweigh the evidence. Such matters are for the

finder of fact, and the verdict of the jury must be sustained if, taking the view most favorable to the State, there is sufficient evidence to support it. *State v. Marks*, 248 Neb. 592, 537 N.W.2d 339 (1995); *State v. Null*, 247 Neb. 192, 526 N.W.2d 220 (1995).

## ANALYSIS

*Second Degree Assault and Dangerous Instruments.*

Bachelor first argues that there was insufficient evidence for the jury to find that he used a dangerous instrument in his fight with Ellis. As a corollary to this argument, Bachelor asserts that the jury was improperly instructed on the definition of "dangerous instrument," in the context of § 28-309, to his detriment.

Nebraska has three statutes relating to assault upon persons: (1) assault in the first degree, § 28-308; (2) assault in the second degree, § 28-309; and (3) assault in the third degree, Neb. Rev. Stat. § 28-310 (Reissue 1995). A person commits first degree assault if he or she intentionally or knowingly causes serious bodily injury to another person. As is pertinent here, a person commits second degree assault if he or she intentionally or knowingly causes bodily injury to another person with a dangerous instrument or recklessly causes serious bodily injury to another person with a dangerous instrument. Third degree assault is when a person intentionally, knowingly, or recklessly causes bodily injury to another person or threatens another in a menacing manner.

While first and second degree assaults are considered felonies, Class III and Class IV respectively, third degree assault is a Class I misdemeanor (unless committed in a fight or scuffle entered into by mutual consent, in which case it is considered a Class II misdemeanor). In the case before us, Bachelor went to trial charged with first and second degree assault, and the jury was instructed on the elements of those crimes and told to consider third degree assault as a lesser-included offense of first degree assault. The jury found Bachelor guilty of second and third degree assault.

Instruction No. 5 directed the jury that it was its duty to convict Bachelor of second degree assault if he "(2) [i]ntentionally or knowingly caused bodily injury to Paul Ellis or recklessly caused serious bodily injury to Paul Ellis; (3) [w]ith a danger-

ous instrument; (4) [i]n York County, Nebraska; (5) [o]n or about November 19, 1992; and (6) [t]hat Todd R. Bachelor did not act in self defense." The district court further instructed that a "dangerous instrument is anything which, because of its nature and the manner and intention of its use, is capable of inflicting bodily injury." The record reveals that the only "thing" which possibly could have satisfied the element of "dangerous instrument" necessary for a second degree assault conviction was Bachelor's teeth. Bachelor argues that because his teeth are part of his body, they cannot be considered as a "dangerous instrument" under § 28-309.

> The inclusion of human body parts, such as fists and teeth, within the class of deadly weapons provokes several conceptual problems. Most obviously, unlike other kinds of weapons, fists and teeth are not external instrumentalities. However, like many other criminal instrumentalities, they may be used to cause death or serious physical injury. This quality has led some courts to classify their use, under some circumstances, as use of a deadly weapon, although the main line of authority discussed infra is to the effect that in no circumstances can fists or teeth be found to constitute deadly or dangerous weapons within the meaning of applicable statutes.

Annot., Parts of the Human Body, Other Than Feet, As Deadly or Dangerous Weapons for Purposes of Statutes Aggravating Offenses Such as Assault and Robbery, 8 A.L.R.4th 1268 at 1269 (1981).

█ While the appellate courts of Nebraska have not addressed the specific issue of whether parts of the human body are dangerous instruments under the second degree assault statute, the Nebraska Supreme Court has defined "dangerous instrument" in that statute, § 28-309, as "any *object* which, because of its nature and the manner and intention of its use, is capable of inflicting bodily injury. It might, for example, be a piece of lumber, a hammer, or many other physical objects." (Emphasis supplied.) *State v. Hatwan*, 208 Neb. 450, 454, 303 N.W.2d 779, 782 (1981) (injury from telephone receiver swung by its cord). Approximately 10 years later, the court in *State v. Ayres*, 236 Neb. 824, 464 N.W.2d 316 (1991), reaffirmed its

decision in *Hatwan*, holding that a "spanking" board qualified as a dangerous instrument, remarking that "the nature of the instrument, the manner of its use, and the intent with which it was used made the board capable of inflicting bodily injury . . . ." *Ayres*, 236 Neb. at 828-29, 464 N.W.2d at 320. Clearly, teeth, given the manner of use and the intent behind their use, are readily capable of inflicting bodily injury, as the photographs of Ellis' face in this case attest. However, recalling the quote with which we began our analysis, see Annot., 8 A.L.R.4th, *supra*, the inquiry does not end here.

In *People v VanDiver*, 80 Mich. App. 352, 263 N.W.2d 370 (1977), VanDiver was charged with felonious assault, under Mich. Comp. Laws Ann. § 750.82 (West 1991), which provides:

> "Any person who shall assault another with a gun, revolver, pistol, knife, iron bar, club, brass knuckles or other dangerous weapon, but without intending to commit the crime of murder, and without intending to inflict great bodily harm less than the crime of murder, shall be guilty of a felony."

VanDiver's felonious assault charge arose out of an incident where VanDiver placed his hand around a 7-year-old child's mouth and nose so that she could not breathe and told her to be quiet or he would kill her. The child managed to escape, and VanDiver was subsequently apprehended. At trial, the child testified that VanDiver did not have a knife, gun, or other weapon.

VanDiver contended that he should not have been charged with felonious assault because the use of bare hands did not constitute a deadly weapon within the meaning of § 750.82. The Michigan Court of Appeals, in addressing an issue of first impression, stated:

> Michigan has at least ten statutes relating to assault upon private persons; among these are "Assault and simple assault" . . . and "Assault and infliction of serious injury" (commonly referred to as aggravated assault) . . . both misdemeanors, and "Assault with intent to do great bodily harm less than murder" . . . and "Assault with intent to commit murder" . . . both felonies. None of these four statutes require that the actor perpetrate the assault with a dangerous weapon. Bare hands are sufficient. What distin-

guishes the misdemeanors, simple assault and aggravated assault, from the felonies, assault with intent to do great bodily harm less than murder and assault with intent to murder, is the actor's intended result. What distinguishes felonious assault . . . from simple assault and aggravated assault is the use of a dangerous weapon in the perpetration of the assault.

(Citations omitted.) *VanDiver*, 80 Mich. App. at 356, 263 N.W.2d at 372. Reasoning that if bare hands were to constitute a weapon, practically every assault would qualify as an aggravated assault, the Michigan Court of Appeals concluded that since the legislature could not have intended to merge separate offenses, assaults with bare hands must have been intended to be treated as assaults without weapons.

In *People v Malkowski*, 198 Mich. App. 610, 499 N.W.2d 450 (1993), the Michigan Court of Appeals extended its holding in *VanDiver* to include teeth. The court stated:

In the present case, the claimed dangerous weapon was the defendant's teeth, which he used to bite the victim on the back. We are not aware of any Michigan authority that holds that teeth are dangerous weapons, unless they belong to a dog. . . . We conclude that a defendant's teeth are not dangerous weapons for the same reasons that his bare hands are not. . . . Our holding is consistent with the great weight of authority from other jurisdictions, which holds that parts of the human body alone cannot constitute a deadly or dangerous weapon.

(Citations omitted.) *Id.* at 614, 499 N.W.2d at 452.

The handful of state cases dealing with the mouth and teeth as a deadly and dangerous weapon have rejected the claim that the mouth and teeth could be considered a deadly and dangerous weapon under any circumstances. In *State v. Calvin*, 209 La. 257, 265, 24 So. 2d 467, 469 (1945), the Supreme Court of Louisiana stated, "We know of no authority of law . . . which classes one's bare hands or teeth as a dangerous weapon." The court also stated that the object must be inanimate to be considered a deadly and dangerous weapon. In *Commonwealth v. Davis*, 10 Mass. App. 190, 406 N.E.2d 417 (1980) (long before Tyson chewed on Holyfield's ears), the defendant bit off a piece

of the victim's ear, which had to be surgically reattached. The defendant was charged with assault and battery by means of a deadly and dangerous weapon. The Massachusetts Court of Appeals held that parts of the human body could never be considered dangerous weapons, "even on a case-by-case basis." *Id.* at 193, 406 N.E.2d at 420. Finally, in *People v. Owusu*, 172 Misc. 2d 357, 659 N.Y.S.2d 976 (1997), the court held that the defendant's natural teeth, which were not sharpened or altered to aggravate their use, were not a dangerous instrument, as a basis for enhancing burglary and assault charges against the defendant. But see *U.S. v. Sturgis*, 48 F.3d 784 (4th Cir. 1995) (where U.S. Court of Appeals found that HIV positive defendant's use of teeth to bite correctional officers amounted to use of "dangerous weapon" under federal and District of Columbia laws), *cert. denied* 516 U.S. 833, 116 S. Ct. 107, 133 L. Ed. 2d 60. The dissent in *Sturgis*, citing *People v VanDiver*, 80 Mich. App. 352, 263 N.W.2d 370 (1977), found that while it would perhaps have been preferable to distinguish assaults on the basis of the seriousness of the injuries inflicted, Congress chose instead to use "weapon" as the distinguishing concept, and that once body parts are deemed weapons, the term ceases to be of any use as a distinguishing factor. See, also, *U.S. v. Moore*, 846 F.2d 1163, 1164 (8th Cir. 1988) (holding teeth were used as "deadly and dangerous weapon" in assault on federal corrections officer, regardless of whether accused did or did not have HIV, as there was no evidence of HIV transmission by bites or via saliva, but court relied on evidence that there are 30 varieties of germs in human mouth which could cause serious infection).

We find the foregoing opinions in *VanDiver, Owusu, Davis*, and *Calvin* to be sound, as is the dissent in *Sturgis*. They represent the majority view. See Carlton D. Stansbury, Comment, *Deadly and Dangerous Weapons and AIDS: The* Moore *Analysis Is Likely To Be Dangerous*, 74 Iowa L. Rev. 951 (1989) (criticizing *Moore* and asserting that *Davis* and *Calvin* represent majority view as courts have been reluctant to expand definition of deadly and dangerous weapon to include human body parts). We now apply the majority view to the Nebraska assault statutes.

If we rule that teeth or other body parts are "dangerous instruments," then virtually every assault which would qualify as a

third degree assault would also be capable of prosecution as second degree assault. A mere push which causes a victim to fall down and be injured, albeit not a "serious bodily injury," has the potential to be a second degree assault if body parts can be dangerous instruments. As a result, the distinction in language between the second and third degree assault statutes, i.e., "dangerous instrument," becomes meaningless, and there is then no basis for distinguishing between second and third degree assault. To inflict bodily injury on another, the actor has to use either a physical object or the actor's own body—feet, hands, fingers, teeth, shoulder, forearm, et cetera. Without excluding body parts from the definition of dangerous instruments, the shove in the bar is no different from a slash with a knife or a gunshot unless there is serious bodily injury, defined as "bodily injury which involves a substantial risk of death, or which involves substantial risk of serious permanent disfigurement, or protracted loss or impairment of the function of any part or organ of the body." Neb. Rev. Stat. § 28-109(20) (Reissue 1989).

We note that any attack involving the use of a body part to inflict serious bodily injury, regardless of how inflicted, remains punishable under the most serious assault statutes, i.e., first degree assault. And mere bodily injury (physical pain, illness, or any impairment of physical condition), see § 28-109(4), by assault without a dangerous instrument, i.e., assault "by body part," is then relegated to the least serious category—third degree assault. Declaring body parts dangerous instruments makes the increased penalty for using a dangerous instrument meaningless and creates ambiguity, if not outright duplication, between second and third degree assault under Nebraska law. Therefore, we hold that, as a matter of law, Bachelor's teeth could not have been considered a dangerous instrument for the purpose of convicting Bachelor of second degree assault under § 28-309. Because the record shows that Bachelor's teeth were the only thing the jury could have found to be a dangerous instrument, we reverse the jury's finding that Bachelor was guilty of second degree assault.

Although Bachelor made a motion to dismiss count II, second degree assault, at the close of the State's evidence, the basis of that motion when read in context is self-defense. At the

instruction conference, there was no motion to dismiss on the ground that teeth or body parts are not included within the meaning of dangerous instrument. Rather, Bachelor's counsel argued that the trial court's proposed definitional instruction of dangerous instrument using the word "anything" was erroneous and that the word "object" from *State v. Hatwan,* 208 Neb. 450, 303 N.W.2d 779 (1981), should be used. Bachelor's counsel also argued that teeth would not be such an object. But, as observed, there was no motion to dismiss. However, a trial court is under an affirmative duty, whether requested or not, to correctly instruct the jury on the law. *State v. Adams,* 251 Neb. 461, 558 N.W.2d 298 (1997). In the instant case, the correct course for the trial court would have been to not submit the matter of second degree assault to the jury under any instruction because teeth are not a dangerous instrument within the meaning of the second degree assault statute. We do not address Bachelor's argument that the district court erred with respect to the language used in its instruction on the definition of dangerous instrument because our holding and the reversal of the conviction for second degree assault makes resolution of this claim unnecessary.

*Third Degree Assault as Lesser-Included Offense.*
Bachelor asserts that because third degree assault is a lesser-included offense of second degree assault, he has been punished twice for the same offense. We recognize that this issue has been "mooted" by our reversal of Bachelor's second degree assault conviction, but we observe that in *State v. Britt,* 1 Neb. App. 245, 493 N.W.2d 631 (1992), we held that third degree assault is a lesser-included offense of second degree assault. In *Britt,* we noted that the only difference in the offenses is simply whether the injury is caused with a dangerous instrument. Thus, *Britt* lends support to our determination that body parts should not be considered dangerous instruments for the purpose of second degree assault under § 28-309, while also recognizing the substance of Bachelor's argument, although moot now, that convictions for both second and third degree assault arising out of the same action would constitute unconstitutional multiple convictions for the same act. See *State v. Bostwick,* 222 Neb. 631, 385 N.W.2d 906 (1986).

*Self-Defense.*

Bachelor's final argument is that there was sufficient evidence adduced at trial to prove that he had acted in self-defense and that the district court erred in accepting the jury's verdict that Bachelor had not acted in self-defense.

In reviewing a criminal conviction, it is not the province of an appellate court to resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or reweigh the evidence. Such matters are for the finder of fact, and the verdict of the jury must be sustained if, taking the view most favorable to the State, there is sufficient evidence to support it. *State v. Marks*, 248 Neb. 592, 537 N.W.2d 339 (1995); *State v. Null*, 247 Neb. 192, 526 N.W.2d 220 (1995).

There is ample evidence to support the jury's decision in this case that Bachelor was not acting in self-defense when he bit Ellis. According to Ellis' testimony, he and Bachelor had locked arms and were pushing and shoving one another when "his arms come around here . . . . His arms holding my waist around, I'd say, right in here, waist, rib area — cage." After Bachelor had Ellis in this "bear hug," Ellis said that Bachelor bit his nose. Some witnesses testified that Ellis had a "stranglehold" on Bachelor's neck prior to the assault, but they did not so indicate that when they were interviewed by police officers shortly after the incident. Moreover, Officer Robert Holmes, an investigating officer, testified that he did not observe any marks, redness, bruising, or lacerations of any type about Bachelor's throat or neck area. Officer Hoffman, the corrections officer who booked Bachelor at the sheriff's department, testified that she did see redness on Bachelor's hands but did not notice any type of markings, bruises, or lacerations on Bachelor's throat. Resolution of these conflicting facts and inferences was for the jury. There was certainly evidence from which the jury could, and did, find that Bachelor had not acted in self-defense when he bit Ellis' nose.

## CONCLUSION

We conclude, as a matter of law, that teeth are not to be considered a "dangerous instrument" under § 28-309, and therefore, we reverse the conviction and sentence for second degree assault. We affirm the jury's verdict of guilty on the charge of

third degree assault. Inherent in that affirmance is our conclusion that there was sufficient evidence for the jury to find that Bachelor did not act in self-defense.

AFFIRMED IN PART, AND IN PART REVERSED.